# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS, DEL RIO DIVISION

| | |
|---|---|
| *PAULA MIRELES Individually and on Behalf of All Heirs and The Estate of EVA MIRELES, deceased, and ADALYNN RUIZ, Individually*<br>      *Plaintiffs*<br><br>**v.**<br><br>**JUAN MALDONADO, an individual; CRIMSON ELIZONDO, an individual; RICHARD BOGDANSKI, an individual; LUKE WILLIAMS, an individual; CHRISTOPHER KINDELL, an individual; JOEL BETANCOURT, an individual; VICTOR ESCALON, an individual; TEXAS DEPARTMENT OF PUBLIC SAFETY DOES 1 through 84; MANDY GUTIERREZ, an individual; UVALDE CONSOLIDATED INDEPENDENT SCHOOL DISTRICT; PEDRO "PETE" ARREDONDO, an individual; ADRIAN GONZALES, an individual; JESUS "JJ" SUAREZ, an individual; and MOTOROLA SOLUTIONS, INC.**<br><br>      *Defendants* | Case No.2:24-cv-00051<br><br>**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**<br><br>(1)  42 U.S.C. § 1983 – 14th Amendment<br><br>(2)  42 U.S.C. § 1983 – 14th Amendment<br><br>(3)  42 U.S.C. § 1983 – 4th Amendment<br><br>(4)  42 U.S.C. § 1983 – Policy and Practice<br><br>(5)  42 U.S.C. § 1983 – Policy and Practice<br><br>(6)  Products Liability or Negligence – Design and Manufacturing Defects<br><br>(7)  Products Liability - Breach of Express or Implied Warranty<br><br>(8)  Products Liability – Failure to Warn<br><br>(9)  Products Liability – Manufacturing Defect<br><br>(10) Damages<br><br>(11) Punitive/Exemplary Damages |

**TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................. 5

II.  JURISDICTION AND VENUE .......................................... 8

III.  THE PARTIES ................................................................... 8
    A.  PLAINTIFFS .............................................................. 8
    B.  DEFENDANTS ........................................................... 9
        i.  Texas Department of Public Safety Defendants ................. 9
        ii.  Uvalde Consolidated Independent School District Defendants .............. 11
        iii.  Motorola Solutions, Inc. ......................................... 13

IV.  ALLEGATIONS APPLICABLE TO ALL COUNTS .......... 13
    A.  THE RISE OF SCHOOL SHOOTINGS IN AMERICA AND THE VULNERABILITY OF OUR SCHOOLS ................................ 14
    B.  STATE-MANDATED LOCKDOWN PROTOCOLS DIRECT STUDENTS AND TEACHERS TO STAY STILL AND SILENT UNTIL LAW ENFORCEMENT OFFICERS RELEASE THEM ................ 16
    C.  IN AN ACTIVE SHOOTER INCIDENT, LAW ENFORCEMENT OFFICERS MUST IMMEDIATELY ISOLATE AND NEUTRALIZE THE SHOOTER ................................ 19
    D.  LAW ENFORCEMENT OFFICERS WHO CONFINE AN ACTIVE SHOOTER WITH LOCKED DOWN CHILDREN AND TEACHERS CREATE A DEATH TRAP ................................ 21
    E.  ROBB ELEMENTARY SCHOOL ................................ 22
    F.  GOING TO SCHOOL ON THE MORNING OF TUESDAY, MAY 24, 2022 ................................ 24
    G.  THE ACTIVE SHOOTER APPROACHES ROBB ELEMENTARY SCHOOL ................................ 26
    H.  THE ACTIVE SHOOTER ENTERS ROBB ELEMENTARY SCHOOL WEST BUILDING ................................ 28
    I.  DEFENDANT OFFICERS FROM THE TXDPS ARRIVE ON SCENE WITHIN TWO MINUTES OF THE SHOOTER ENTERING THE SCHOOL, WHILE THE SHOOTER IS SHOOTING INSIDE CLASSROOMS 111 AND 112 ................................ 30
    J.  DEFENDANT UCISD-PD OFFICERS RETREAT, TRAPPING STUDENTS AND TEACHERS WITH THE ACTVE SHOOTER, WHILE DEFENDANT TXDPS OFFICERS HESITATE ................................ 31
    K.  THE UVALDE COUNTY DISTRICT ATTORNEY'S OFFICE ALERTS DEFENDANT TXDPS RANGER KINDELL ABOUT THE ACTIVE SHOOTING ................................ 34
    L.  OFFICERS, INCLUDING DEFENDANTS, KNEW THERE WERE STUDENTS AND TEACHERS IN CLASSROOMS 111 AND 112 AND THEY KEPT THOSE STUDENTS AND TEACHERS TRAPPED WITH THE SHOOTER ................................ 35

2

M.    OFFICERS, INCLUDING DEFENDANTS, STOP PARENTS FROM RESCUING THE CHILDREN TRAPPED INSIDE CLASSROOMS 111 AND 112 ................................................................................................ 37

N.    OFFICERS SAVED THEMSELVES, NOT CHILDREN, FROM THE SHOOTER'S LETHAL BATTLE RIFLE ............................................ 38

O.    OFFICERS, INCLUDING DEFENDANTS, ARE INDIFFERENT TO THE FACT THAT A TEACHER IS DYING INSIDE CLASSROOM 112 ...................................................................................................... 39

P.    MIAH CERRILLO CALLS 911 FROM INSIDE CLASSROOM 112 AND OFFICERS ARE INDIFFERENT TO HER CRY FOR HELP .............................................................................. 41

Q.    OFFICERS' DECISION TO CONTAIN THE SHOOTER WITH HIS VICTIMS CAUSED CHILDREN TO SUFFER AND DIE .............................. 44

R.    PLAINTIFFS HAVE RECEIVED LITTLE TRANSPARENCY AND NO ACCOUNTABILITY ........................................................................... 45

V.    FIRST CAUSE OF ACTION: ALL PLAINTIFFS AGAINST TXDPS DEFENDANTS AND INDIVIDUAL UCISD-PD DEFENDANTS, VIOLATION OF 42 U.S.C. § 1983 (VIOLATION OF FOURTEENTH AMENDMENT, SUBSTANTIVE DUE PROCESS CLAUSE/SPECIAL RELATIONSHIP) ................. 48

VI.    SECOND CAUSE OF ACTION: ALL PLAINTIFFS AGAINST TXDPS DEFENDANTS AND INDIVIDUAL UCISD-PD DEFENDANTS, VIOLATION OF 42 U.S.C. § 1983 (SUBSTANTIVE DUE PROCESS, STATE CREATED DANGER) ........................................................................................... 51

VII.    THIRD CAUSE OF ACTION: ALL PLAINTIFFS AGAINST TXDPS DEFENDANTS AND INDIVIDUAL UCISD-PD DEFENDANTS, VIOLATION OF 42 U.S.C. § 1983 (VIOLATION OF FOURTH AMENDMENT, UNLAWFUL SEIZURE) ............................................................................... 52

VIII.    FOURTH CAUSE OF ACTION: ALL PLAINTIFFS AGAINST DEFENDANT ARREDONDO IN HIS OFFICIAL CAPACITY, UVALDE CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, VIOLATION OF 42 U.S.C. § 1983 (VIOLATION OF FOURTH AND FOURTEENTH AMENDMENTS, FAILURE TO TRAIN/CREATION OF POLICY) ......................................................... 53

IX.    FIFTH CAUSE OF ACTION: ALL PLAINTIFFS AGAINST DEFENDANT ARREDONDO IN HIS OFFICIAL CAPACITY, UVALDE CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, VIOLATION OF 42 U.S.C. § 1983 (FOURTEENTH AMENDMENT SPECIAL RELATIONSHIP AND STATE CREATED DANGER, FAILURE TO TRAIN/CREATION OF POLICY) ................. 54

X.    SIXTH CAUSE OF ACTION: ALL PLAINTIFFS AGAINST MOTOROLA SOLUTIONS, INC., PRODUCTS LIABILITY – FAILURE TO WARN .................... 55

XI.     SEVENTH CAUSE OF ACTION: ALL PLAINTIFFS AGAINST MOTOROLA
SOLUTIONS, INC., PRODUCTS LIABILITY – MANUFACTURING DEFECT.......56

XII.    DAMAGES.................................................................................................57
      A.    SURVIVAL DAMAGES OF DECEASED PLAINTIFF ...................................57
      B.    WRONGFUL DEATH BENEFICIARY DAMAGES OF SURVIVING
           PARENTS AND HEIRS........................................................................58
XIII.   PUNITIVE AND EXEMPLARY DAMAGES ................................................59

XIV.  RELIEF SOUGHT.......................................................................................59

<u>**PLAINTIFFS' ORIGINAL COMPLAINT**</u>

Plaintiffs, **Paula Mireles,** Individually and on Behalf of all Heirs and the Estate of **Eva Mireles, deceased** and **Adalynn Ruiz,** Individually, state the following claims for relief against the Defendants.

## I.      <u>INTRODUCTION</u>

1.      This case arises from the single greatest failure of law enforcement to confront an active shooter in American history.

2.      Most Texas elementary school classrooms have the same poster by the door that was in Robb Elementary School's Classroom 111: "LOCKDOWN! LOCKS, LIGHTS, OUT OF SIGHT."

3.      Because Texas public schools do not have the funds necessary to harden entry points and have a security officer on campus full-time, Texas schools rely on the supposed protection of the lockdown drill when an active shooter attacks a school. Texas is not alone in this. States all across America mandate lockdown drills as preparation for an active shooter incident on campus, because children and parents need some way to believe our schools can be safe.

4.      The truth is that against a shooter with an AR-15, a lockdown is barely any protection at all. Relying on silence and stillness, children play a deadly round of hide-and-seek with a killer. Their silence and stillness is proof of faith that what they have been taught will protect them – and faith that law enforcement officers will stop at nothing to end the bloody game before the shooter finds and kills them.

5.      Children, parents, and teachers must have that faith for our schools to function. Without it, why would we trust our children to a school's care, in these terrible days of shooting after shooting?

6.     At Robb Elementary School on May 24, 2022, law enforcement officers destroyed that faith because of an AR-15.

7.     In an active shooter incident, any and all officers must follow active shooter protocols, and immediately neutralize the active shooter. Instead, fearful of the Shooter's "battle rifle," the 376 officers who responded to Robb Elementary School turned a lockdown into a death trap. For one hour, fourteen minutes and eight seconds, responding officers "contained" an active shooter with thirty children and three teachers. The containment strategy meant officers could avoid advancing. Instead of facing down a shooter with an AR-15, officers left children to face him.

8.     That containment strategy caused immeasurable suffering. It made hide-and-seek easy for the Shooter. It enabled the Shooter to torture and terrify wounded and dying children and to find and kill children who were trying to hide. It deprived wounded children and teachers of the chance to survive.

9.     These officers' betrayal of their duty was absolute. "The officers have weapons, the children had none. The officers had body armor, the children had none. The officers had training, the subject had none," TXDPS Director McCraw testified before the Texas Senate Special Committee to Protect all Texans.

10.     "The law enforcement response to the attack at Robb Elementary was an abject failure and antithetical to everything we've learned over the last two decades since the Columbine massacre," Director McCraw continued.

11.     Law enforcement officers' actions were "indefensible," and "utterly unacceptable," in the words of Senator Ted Cruz.

12.     "What happened in Uvalde is not acceptable behavior in the eyes of the law enforcement community of the state of Texas," Jimmy Perdue, Chief of North Richland Hills police and president of the Texas Police Chiefs Association, told the Texas Senate.

13.     "Our profession failed [on that] date," Stan Standridge, San Marcos Police Chief testified.

14.     The craven actions of the Uvalde County Independent School District Police Department (UCISD-PD) have been widely publicized and are well-known, but the equally culpable actions by Texas Department of Public Safety (TXDPS) officers have been shielded from public scrutiny. It is time for the Texas Department of Public Safety to account to Uvalde's families, and to Texas's schools, teachers, school children, and their parents. Ninety-one TXDPS officers responded to Robb Elementary School on May 24, 2022, while the UCISD-PD had five on scene. The TXDPS 2022 budget was $1.6 billion; the UCISD's budget was three-tenths of one percent (.03%) of that amount. The leadership and tactical skills and experience of defendant TXDPS officers like **Texas Ranger Christopher Kindell** and even **TXDPS Sergeant Juan Maldonado** far outstripped the experience and abilities of **UCISD-PD Chief Arredondo**, and everyone on scene knew it.

15.     TXDPS has fought the public disclosure of its own officers' body camera footage, radio channel recordings, dispatch logs, and officer interviews and investigations. This lawsuit seeks to end that cover-up.

16.     Plaintiffs are the mother and daughter of the deceased Robb Elementary School teacher Eva Mireles.

17.     Defendants are officers and law enforcement agencies who confined students and teachers, including the deceased Plaintiff, in Classrooms 111 and 112 at Robb Elementary School

with the active shooter, giving the Shooter the opportunity to torture and terrify wounded and dying children and to find and kill children who were trying to hide. Defendants are the officers and law enforcement agencies who prevented medical aid from reaching the wounded, including the deceased Plaintiff Eva Mireles, in those classrooms.

18.     This lawsuit seeks accountability and transparency for Defendants' actions on May 24, 2022.

## II.     JURISDICTION AND VENUE

19.     This case is brought pursuant to 42 U.S.C. § 1983 and under state law.

20.     Jurisdiction is conferred on this Court based upon 28 U.S.C. §§ 1331 (federal question) and 1343 (federal civil rights). The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367, because the state law claims are intertwined with the federal claims.

21.     Venue is proper in the Western District of Texas, Del Rio Division, under 28 U.S.C. § 1391(b)(1) and (2) because at least one Defendant resides within this district. Defendants regularly conduct business in this district, and the wrongdoing giving rise to Plaintiffs' claims occurred in Uvalde County, Texas, which is within this district and division. *See* 28 U.S.C. § 124(d)(5).

## III.     THE PARTIES

### A.     PLAINTIFFS

22.     **Plaintiff Paula Mireles** brings claims Individually, as Wrongful Death Beneficiary as Representative of the Estate and all Heirs of **Eva Mireles**, her daughter, a deceased adult who was forty-four years old and a teacher at Robb Elementary School on May 24, 2022**. Paula Mireles** is, and **Eva Mireles** was, a resident of Texas.

23.     **Plaintiff Adalynn Ruiz** brings claims Individually, as Wrongful Death Beneficiary of **Eva Mireles**, her mother, a deceased adult who was forty-four years old and a teacher at Robb Elementary School on May 24, 2022. **Adalynn Ruiz** is, and **Eva Mireles** was, a resident of Texas.

**DEFENDANTS**

i.      **Texas Department of Public Safety Defendants**

24.     At all times relevant to this suit, **Defendant Juan Maldonado** was a TXDPS Sergeant and was acting as such at Robb Elementary School on May 24, 2022. **Defendant Juan Maldonado** is an individual residing in the state of Texas. He is being sued in his individual capacity. **Juan Maldonado** may be served at 121 W Mill St, Uvalde, TX 78801-5931, or wherever he may be found. **Defendant Juan Maldonado** arrived on scene at approximately 11:34 a.m.

25.     At all times relevant to this suit, **Defendant Crimson Elizondo** was a TXDPS Trooper and was acting as such at Robb Elementary School on May 24, 2022. **Defendant Crimson Elizondo** is an individual residing in the state of Texas. She is being sued in her individual capacity. **Crimson Elizondo** may be served at 216 Minter St, Uvalde, TX 78801-4215, or wherever she may be found. **Defendant Crimson Elizondo** arrived on scene at approximately 11:35 a.m.

26.     At all times relevant to this suit, **Defendant Richard Bogdanski** was a TXDPS Trooper and was acting as such at Robb Elementary School on May 24, 2022. **Defendant Richard Bogdanski** is an individual residing in the state of Texas. He is being sued in his individual capacity. **Richard Bogdanski** may be served at 129 Shady Terrace Ln, Rockport, TX 78382-7977, or wherever he may be found. **Defendant Richard Bogdanski** arrived on scene at 11:49 a.m. or earlier.

27.     At all times relevant to this suit, **Defendant Luke Williams** was a TXDPS Special Agent and was acting as such at Robb Elementary School on May 24, 2022. **Defendant Luke**

**Williams** is an individual residing in the state of Texas. He is being sued in his individual capacity. **Luke Williams** may be served wherever he may be found. **Defendant Luke Williams** arrived on scene at approximately 11:53 a.m.

28.     At all times relevant to this suit, **Defendant Christopher Kindell** was a Texas Ranger with the TXDPS and was acting as such at Robb Elementary School on May 24, 2022. **Defendant Christopher Kindell** is an individual residing in the state of Texas. He is being sued in his individual capacity. **Christopher Kindell** may be served at 1 El Norte Cir, Uvalde, TX 78801-4020, or wherever he may be found. **Defendant Christopher Kindell** arrived on scene at approximately 11:59 a.m.

29.     At all times relevant to this suit, **Defendant Joel Betancourt** was a TXDPS Captain and was acting as such at Robb Elementary School on May 24, 2022. **Defendant Joel Betancourt** is an individual residing in the state of Texas. He is being sued in his individual capacity. **Joel Betancourt** may be served at 3143 Homer Dr, Laredo, TX 78041-1936, or wherever he may be found. **Defendant Joel Betancourt** arrived on scene at approximately 12:30 p.m.

30.     At all times relevant to this suit, **Defendant Victor Escalon** was the Regional Director of the South Texas Region of the Texas Department of Public Safety and was acting as such at Robb Elementary School on May 24, 2022. **Defendant Victor Escalon** is an individual residing in the state of Texas. He is being sued in his individual capacity. **Victor Escalon** may be served at 216 Ben Hogan Ave, McAllen, TX 78503-3113, or wherever he may be found. **Defendant Victor Escalon** arrived on scene prior to 12:50 p.m.

31.     **Defendants TXDPS Does 1 through 84** are officers of the Texas Department of Public Safety who were present at Robb Elementary on May 24, 2022, and acted, or failed to act, with deliberate indifference to the constitutional rights of the Plaintiffs and the rights of the

Plaintiffs under state law and are liable to Plaintiffs. At all relevant times **Does 1 through 84** were acting in the scope of their employment, under color of state law, and in their individual capacities. **Does 1 through 84** are sued in their individual capacities.

32.   **Defendants Juan Maldonado**, **Crimson Elizondo**, **Richard Bogdanski**, **Luke Williams, Christopher Kindell, Joel Betancourt, Victor Escalon**, and **TXDPS Does 1 through 84** are hereafter referred to as the "**TXDPS Defendants**," all of whom were acting within the course and scope of their employment and under color of state law at all relevant times on May 24, 2022.

   **ii.    Uvalde Consolidated Independent School District Defendants**

33.   **Defendant Uvalde Consolidated Independent School District ("UCISD")** is a public school district in Uvalde, Texas. Robb Elementary School is/was one of the schools within the **UCISD**. **UCISD** was at all relevant times responsible for the care, safety, management and security of Robb Elementary School students, teachers and campus. The Uvalde Consolidated Independent School District Police Department, ("UCISD-PD") is an agency of the **UCISD**. The **UCISD** is and was charged by law with the administration and operation of the UCISD-PD, including the training, policies and practices of the UCISD-PD, and is legally responsible for the acts and omissions of the UCISD-PD. Pursuant to Chapter 37 of the Texas Education Code, the **UCISD** board set forth a policy authorizing commissioned peace officers to enforce rules adopted by the board and focused on the protection of school district students, staff, buildings, and grounds. At all relevant times, the UCISD-PD was directed to enforce appropriate rules for the orderly conduct of the district in carrying out its purposes and objectives as a separate jurisdiction relating to the conduct of its students and personnel. On May 24, 2022, the UCISD-PD employed five officers. **Defendant UCISD** may be served with process through UCISD Superintendent Ashley

Chohlis and/or through UCISD Board of Trustees President Calvin Lambert at 1000 North Getty Street, Uvalde, Texas 78801, or wherever they may be found.

34.     At all times relevant to this suit, **Defendant Mandy Gutierrez** was the Principal of Robb Elementary School and was acting as such on May 24, 2022. She is being sued in her official and individual capacities. **Mandy Gutierrez** may be served at 320 W Benson Rd, Uvalde, TX 78801-3904, or 431 Evans St, Uvalde, TX 78801-5845, or wherever she may be found.

35.     At all times relevant to this suit, **Defendant Pedro "Pete" Arredondo** was the Chief of the UCISD-PD and was acting as such at Robb Elementary School on May 24, 2022. **Defendant Pedro "Pete" Arredondo** is an individual residing in the state of Texas. He is being sued in his official and individual capacities. **Pedro "Pete" Arredondo** may be served at 101 Larkspur Dr, Uvalde, TX 78801-6303, or wherever he may be found. **Defendant Pedro "Pete" Arredondo** entered the West building at 11:35 a.m.

36.     At all times relevant to this suit, **Defendant Adrian Gonzales** was an Officer of the UCISD-PD and was acting as such at Robb Elementary School on May 24, 2022. **Defendant Adrian Gonzales** is an individual residing in the state of Texas. He is being sued in his individual capacity. **Adrian Gonzales** may be served at 474 Spinnaker Loop, Kyle, TX 78640-2594, or 317 Studer Cir, Uvalde, TX 78801-4041, or wherever he may be found. **Defendant Adrian Gonzales** entered the West building at 11:35 a.m.

37.     At all times relevant to this suit, **Defendant Jesus "JJ" Suarez** was an Officer of the UCISD-PD and was acting as such at Robb Elementary School on May 24, 2022. **Defendant Jesus "JJ" Suarez** is an individual residing in the state of Texas. He is being sued in his individual capacity. **Jesus "JJ" Suarez** may be served at 617 E Leona St, Uvalde, TX 78801-4410, or Southwest Texas Junior College, at 2401 Garner Field Road, Uvalde, Texas 78801, or wherever

he may be found. **Defendant Jesus "JJ" Suarez** entered the West building at approximately 11:41 a.m.

38.      **Defendants Pete Arredondo, Adrian Gonzales, and Jesus Suarez** are hereafter referred to as the "**UCISD-PD Defendants**," all of whom were acting within scope of employment and under color of state law at all relevant times on May 24, 2022.

   iii.   **Motorola Solutions, Inc.**

39.      At all relevant times to this suit, based on information and belief, **Defendant Motorola Solutions, Inc. ("Motorola")** designed and/or sold the radio communication devices used by some of the first responders while responding to the Robb Elementary School Shooting on May 24, 2022. **Motorola** is a Delaware corporation with its principal office in Chicago, Illinois. **Motorola** is a communications technology company that develops and implements mobile, radio, and wireless communication systems, command center software, and security systems for government and commercial customers worldwide. **Motorola** may be served with process by serving its registered agent, C T Corporation System, at 208 SO Lasalle Street, Suite 814, Chicago, Illinois 60604-1101.

## IV.   ALLEGATIONS APPLICABLE TO ALL COUNTS

40.      On May 24, 2022, at Robb Elementary School, 376 officers responded to the scene. Those officers' actions trapped children, rather than releasing them. Officers increased the risk that children would be shot, rather than protecting them. Officers who would not help trapped children stopped parents from reaching them. Officers blocked medics from reaching the wounded until it was too late. This complaint begins to unveil what happened that day.

**A.   THE RISE OF SCHOOL SHOOTINGS IN AMERICA AND THE VULNERABILITY OF OUR SCHOOLS**

41.     On April 20, 1999, two high school seniors massacred twelve students and a teacher at Columbine High School in Littleton, Colorado. It was the worst school shooting America had ever seen.

42.     Since the Columbine shooting, the number of school-related gun incidents has increased, and school shootings have become increasingly fatal. More than 370,000 students have experienced gun violence at school since Columbine.

43.     In the five years immediately before the Robb Elementary School shooting, the incidence and fatality of school shootings rose even more exponentially.

44.     In the 2017-2018 school year, a student's chance of dying in a school shooting reached its highest level in at least 25 years.

45.     The 2021-2022 school year had the highest number of school shootings since record-keeping began in 2000.

46.     Also, since Columbine, America has seen more and more attacks on schools where the attacker intends to carry out a mass killing.

47.     On April 16, 2007, a student at Virginia Tech University shot and killed 32 students and educators and wounded at least 17 more people.

48.     On December 14, 2012, a troubled young man used an AR-15-style rifle to murder 20 children and six educators at Sandy Hook Elementary School in Newtown, Connecticut.

49.     On February 14, 2018, a gunman opened fire on students, teachers, and staff at Marjory Stoneman Douglas High School in Parkland, Florida, killing 17 and injuring 17 more.

50.     School shootings have created a massive school security industry, on which schools are spending $3 billion per year. Schools are implementing single-point-of-entry access, imposing

visitor restrictions, automatically dead-bolting doors, installing bulletproof glass and panic buttons, and increasing the number and presence of security personnel.

51.     Texas had its own school shooting tragedy in May 2018. In what Governor Abbott called "one of the most heinous attacks that we've ever seen in the history of Texas schools," a student at Santa Fe High School in Santa Fe, Texas shot and killed eight students and two teachers and wounded 13 others. The attack ended when school security officers and a state trooper confronted and exchanged fire with the shooter.

52.     Texas's response to the Santa Fe shooting included legislation directing school districts to implement multi-hazard emergency operation plans, required additional training for school resource officers and school district employees, and created school threat assessment teams. As part of that response, Texas's Commissioner of Education promulgated rules requiring regular lockdown drills. Governor Abbott said the legislative package would do "more than Texas has ever done to make schools safer places for our students, for our educators, for our parents and families."

53.     But the massive investment it would take to actually harden Texas schools against an attacker with a battle rifle was not made. Texas's schools were not suddenly "safer places." This state's nearly 9,000 school campuses were almost all built before defense against a gunman with an AR-15 was a design necessity, and the legislature was not willing to appropriate the amount necessary to fund upgrades that could give students and teachers some protection from an active shooter.

54.     Uvalde County Independent School District, with its 4,116 students at eight school campuses, received $69,000 to harden its schools in the wake of the Santa Fe shooting. Part of this

money went to build a five-foot perimeter fence around Robb Elementary School. On May 24, 2022, the Shooter easily jumped over that fence.

55.     In today's Texas, just like in the rest of America, the question is not if another mass shooting at a school will occur; the question is when.

56.     For Texas's schools, especially poorer schools like those in Uvalde County, it would be a matter of minutes at best, and seconds at worst, before an active shooter gained entry to the school. Students and teachers' survival would depend on the speed and effectiveness of the law enforcement response.

**B.     STATE-MANDATED LOCKDOWN PROTOCOLS DIRECT STUDENTS AND TEACHERS TO STAY STILL AND SILENT UNTIL LAW ENFORCEMENT OFFICERS RELEASE THEM**

57.     Texas Education Code § 37.114 provides that the Texas Commissioner of Education, in consultation with the Texas School Safety Center and the state fire marshal, must adopt rules for best practices for conducting emergency school drills and exercises, including definitions for relevant terms.

58.     As part of the effort to make Texas schools safer after the Santa Fe High School shooting, the Commissioner of Education Mike Morath issued Texas Administrative Code Rule § 103.1209, "Mandatory School Drills."

59.     The Commissioner's new rules required school districts to conduct emergency safety drills. One of these was the lockdown drill.

60.     The rule defined a lockdown drill as "[a] response action schools take to secure interior portions of school buildings and grounds during incidents that pose an immediate threat of violence inside the school. The primary objective is to quickly ensure all school students, staff, and visitors are secured away from immediate danger." 19 Tex. Admin. Code § 103.1209(b)(3).

16

61.     The Texas School Safety Center (TxSSC) is an official university-level research center at Texas State University in San Marcos, Texas, which provides K-12 schools in Texas with safety and security protocols and guidance, determining best practices for Texas schools.

62.     TxSSC provides a Standard Response Protocol for a lockdown ("the Texas Lockdown SRP").

63.     The Texas Lockdown SRP provides that "Lockdown is called when there is a threat or hazard **inside** the school building. From parental custody disputes to intruders to an active shooter, Lockdown uses classroom and school security actions to protect students and staff from threat."

64.     The Texas Lockdown SRP continues, "The Lockdown Protocol demands locking individual classroom doors, offices and other securable areas, moving room occupants out of line of sight of corridor windows and having room occupants maintain silence."

65.     Per the Texas Lockdown SRP, teachers and students must keep the classroom door closed until law enforcement officers open it: "Teacher, staff, and student training reinforces the practice of **not** opening the classroom door, once in Lockdown. Rather, no indication of occupancy should be revealed until first responders open the door." That is, teachers and their students are trained – by official requirements – to remain in their classrooms during lockdowns with the door closed until law enforcement officers authorize them to leave.

66.      TxSSC materials, including the "Training and Drills" section of the "A Parent's Guide to School Safety Toolkit" provide that parents should assure their children that the better they follow the lockdown drill instructions, the safer they will be in a real shooting.

67.     Per the TxSSC Parent's Guide, parents should teach their children to wait for law enforcement, even if it is a "a real active threat emergency, such as an active shooter."

68.     Also, per the TxSSC Parent's Guide, students are not to use their phones: "During the lockdown drill, which is the drill used when a threat is located inside the school building, the skill of staying quiet is important to practice. During this drill, and in a real-life event, student and staff cellphones are to be silenced, and everyone is to stay quiet."

69.     19 Tex. Admin. Code § 103.1209 directs that schools conduct lockdown drills at least twice per year.

70.     As required by Texas law, Robb Elementary School, including the teachers and students in Classrooms 111 and 112, trained on the Texas Lockdown SRP.

71.     The teachers and students in Classrooms 111 and 112, and all of Robb Elementary School's faculty and students, were familiar with lockdowns. Because of the school's proximity to the border, teachers and students had experienced multiple lockdowns, in addition to the two drills per year required by Texas law.

72.     Robb teachers and students relied on and followed the lockdown protocols prescribed by the State of Texas. The lockdown summary protocol was posted just inside classroom doors: "LOCKDOWN: LOCKS, LIGHTS, OUT OF SIGHT." The posting directed students to move out of sight, to maintain silence, and to not open the door. It instructed teachers to: lock interior doors; turn out the lights; move away from sight, not open the door; maintain silence; and take attendance. Once locked down, students at Robb Elementary School – just like students at any other Texas school – would wait for law enforcement officers to come.

## C.     IN AN ACTIVE SHOOTER INCIDENT, LAW ENFORCEMENT OFFICERS MUST IMMEDIATELY ISOLATE AND NEUTRALIZE THE SHOOTER

73.     The law enforcement community's agreed definition of active shooter is "an individual actively engaged in killing or attempting to kill people in a confined and populated area." (The White House, United States Department of Justice, Federal Bureau of Investigation, United

States Department of Education, United States Department of Homeland Security and Federal Emergency Management Agency use this definition, as do other law enforcement agencies and training providers across the country).

74.     The definition of an active shooter – "an individual actively engaged in killing or attempting to kill people in a confined and populated area" – dictates the law enforcement response. It is law enforcement's job to immediately isolate and neutralize someone who is actively engaged in killing or attempting to kill people in a confined and populated area.

75.     Analysis of the failed law enforcement response to the 1999 Columbine school shooting led to a crystal-clear active shooter response doctrine.

76.     At Columbine, officers on the scene set up a perimeter and waited 47 minutes before entering the school. While they delayed, the two Columbine shooters casually killed and wounded students – and wounded students bled where they lay. Some died because of the law enforcement delay. Until Uvalde, Columbine was the model for what not to do.

77.     The lesson from Columbine was simple. Law enforcement delay in neutralizing an active shooter in a school would be measured in students' lives lost. A new active shooter doctrine was adopted by law enforcement agencies across the country. First responders must react immediately to confront the shooter to prevent further killing and to urgently render first aid to victims. In short, in an active shooter event, officers must confront the subject and stop his actions immediately. TXDPS Director McCraw acknowledged the standard: "the doctrine since [Columbine] has been that in an active shooter situation, it's to immediately locate the subject, isolate him and neutralize him."

78.     Advanced Law Enforcement Rapid Response Training (ALERRT) is nationally recognized as the preeminent active shooter/attack response training provider in the nation.

ALERRT is based at Texas State University in San Marcos, Texas. More than 200,000 state, local, and tribal first responders (over 140,000 of them law enforcement) from all 50 states, the District of Columbia, and U.S. territories have received ALERRT training over the last 20 years.

79.     Each and every law enforcement department in the state of Texas, especially and including all departments present at Robb Elementary School on May 24, 2022, subscribed to, were trained on, and were bound to follow ALERRT protocols and training. TXDPS's training program includes a Reality Based Training Unit, which instructs the ALERRT Level 1 course to department members.

80.     ALERRT teaches that first responders' main priority in an active shooter incident is to first "Stop the Killing," then "Stop the Dying," and then "Evacuate the Injured."

81.     Officers responding to an active school shooting are to draw the shooter's attention away from potential victims, draw the shooter away from new or wounded victims, and take immediate action to neutralize the shooter, including use of necessary and deadly force.

82.     ALERRT doctrine requires law enforcement to act immediately. Waiting for equipment, more highly trained officers, and all other forms of delay are unacceptable.

83.     Even waiting for a four-or five-person team of first-on-site officers to gather is not acceptable. Recent tactical training emphasizes solo officer response when the situation demands. The doctrine provides that, "[i]n many cases that immediate response means a single (solo) officer response until such times as other forces can arrive. The best hope that innocent victims have is that officers immediately move into action to isolate, distract or neutralize the threat, even if that means one officer acting alone."

84. From the moment a shot is fired at a school, it is an active shooter incident. "When a subject fires a weapon at a school he remains an active shooter until he is neutralized and is not to be treated as a 'barricaded subject,'" said TXDPS Director McCraw.

85. Director McCraw's statement is elementary: someone who fires a weapon at a school cannot be a barricaded subject. The International Association of Chiefs of Police defines a barricaded subject as "an individual who is the focus of a law enforcement intervention effort, who has taken a position in a physical location that does not allow immediate law enforcement access and is refusing law enforcement orders to exit" and "who is not suspected of committing a crime."

86. ALERRT doctrine addresses the fact that taking immediate action to isolate and neutralize an armed attacker may be very dangerous for law enforcement officers. The doctrine clearly determines priority of life. The first priority is to preserve the lives of victims and potential victims. The second priority is the safety of officers, and the last priority is the suspect. Under ALERRT protocols, officers must act immediately, regardless of the risk to themselves.

**D. LAW ENFORCEMENT OFFICERS WHO CONFINE AN ACTIVE SHOOTER WITH LOCKED DOWN CHILDREN AND TEACHERS CREATE A DEATH TRAP**

87. "If you don't immediately confront an active shooter, lives are going to be lost," TXDPS Director McCraw stated.

88. Lockdown protocols work in tandem with ALERRT immediate response protocols. Teachers and students are trained and required to freeze, hide, and stop any other efforts to protect themselves precisely *because* law enforcement officers will respond immediately to keep students safe and stop the threat. Teachers and students do this because they are following rules laid down by Texas's Commissioner of Education.

89.     Lockdown deprives teachers and students of assistance from anyone but law enforcement. Parents and family members cannot contact them, find them, or reach them. Emergency medical responders cannot get through the law enforcement perimeter to treat the wounded. Once law enforcement officers arrive and set up a perimeter, they have undertaken to be the lone vector of rescue for teachers and students.

90.     Responding law enforcement officers have the sole power to determine how long locked down students and teachers will be confined with the shooter.

91.     According to ALERRT doctrine, the time of confinement in lock down with the active shooter should be as close to zero as possible, because the overwhelming priority is to "stop the killing and stop the dying."

92.     By prolonging a lockdown in an active shooter incident, law enforcement officers trap and confine students and teachers with the active shooter.

93.     By prolonging a lockdown in an active shooter incident, law enforcement officers require that trapped teachers and students remain in place, and thus increase the likelihood that a shooter will find and shoot a child or a teacher and that wounded victims will die.

94.      By prolonging a lockdown, law enforcement officers increase the terror and trauma students and teachers endure.

95.     Law enforcement officers know all of this. This is exactly why ALERRT training mandates an immediate neutralization of the shooter.

E.     ROBB ELEMENTARY SCHOOL

96.     Uvalde is a close-knit community. About 25,000 people live in Uvalde County, including the roughly 15,000 who live in the City of Uvalde.

97.     In the 2021-22 school year, Uvalde County Independent School District had 4,102 students. Robb Elementary School held the classrooms for about 600 second, third and fourth grade students.

98.     The ties between Uvalde's law enforcement community and its schools were particularly close. Law enforcement officers' children attended Robb Elementary, and their wives taught there. Robb Elementary's West building was full of fourth grade classrooms.



*Diagram of Robb Elementary School West Building*

**F.     GOING TO SCHOOL ON THE MORNING OF TUESDAY, MAY 24, 2022**

99.     May 24, 2022, was a Tuesday, and school started at 7:30 am.

100.     On the morning of May 24, 2022, **Eva Mireles** had plans to teach her fourth-grade students and to continue bringing knowledge and light to her young students' lives.



*Eva Mireles*

101.    The fourth-grade teachers led their students back to the classrooms lining the hallways of the West building.

102.     Teacher Arnulfo Reyes walked with his eleven students back to Classroom 111. Teachers, **Plaintiff Eva Mireles,** and Irma Garcia took their nineteen students back to Classroom 112.



*Diagram of the Classrooms and Hallway Adjacent to Classrooms 111 and 112*

103.    Like most other classrooms in the building, Classrooms 111 and 112 shared a double-width interior door.

104.     In Classroom 111, the students went back to watching *The Addams Family* while Mr. Reyes did some work at his desk. They had started watching the movie earlier that morning before the assembly.

105.    In Classroom 112, teachers, **Deceased Plaintiff Eva Mireles**, and Irma Garcia and their nineteen students were watching *Lilo and Stitch.*

**G.     THE ACTIVE SHOOTER APPROACHES ROBB ELEMENTARY SCHOOL**

106.    At 11:28 a.m., a young man (hereafter "the Shooter") crashed his truck in a ditch approximately 100 yards from Robb Elementary School. His plan was to "shoot up" Robb Elementary School. (11:28 a.m.).

107.    The Shooter got out of the truck and started firing. (11:29 a.m.).

108.    Uvalde's 911 dispatcher started to receive calls reporting shots fired. (11:29 a.m.).

109.    The Shooter climbed over the school's perimeter fence on the west side of the campus. (11:29 a.m.).

110.    Uvalde's 911 dispatcher received a report that the Shooter was on the school campus. (11:29 a.m.).

111.    Uvalde Police Department (hereafter "UPD") broadcast that shots had been fired at Robb Elementary School. The broadcast asked all units to respond. (11:30 a.m.).

112.     Once a shot is fired at a school, it is an active shooter incident. As TXDPS Director McCraw has testified, "[w]hen a subject fires a weapon at a school he remains an active shooter until he is neutralized…." This was an active shooter incident.

113.    The Shooter kept shooting from the school parking lot near the West building. Then he walked along the outside of the West building. He fired into Classroom 102, shattering parts of the exterior window. (11:32 a.m.).

114.     Inside Classroom 102, children lay flat on the floor. (Allegations concerning the timing and sequencing of events inside the classrooms cannot be made with the same degree of specificity or certainty as allegations regarding most events taking place outside the classrooms. Plaintiffs therefore do not allege the time of events inside the classrooms.)

26

115.    The Shooter kept moving. He walked by the windows of Classrooms 103, 104, 105, and 106.

116.    All of those classrooms had students and/or teachers inside. In Classroom 106, the teacher hid her students and prayed.

117.    The Shooter fired three barrages into the exterior walls and windows of those classrooms. (11:32 a.m.).



*Diagram of Shooter's Movement Toward West Building*

118.    Officers arriving on scene heard shots fired and knew this was an active shooter. (11:32 a.m.). At least one officer already on scene was armed with an AR-15 and extra magazines.

**H.    THE ACTIVE SHOOTER ENTERS ROBB ELEMENTARY SCHOOL WEST BUILDING**

119.    The Shooter entered the West building via its northwest door, which was closed but unlocked. (11:33 a.m.).

120.    The Shooter walked into the northwest hallway, then turned right. Classrooms 111 and 112 were on his left; Classrooms 105 and 106 were on his right. He started shooting into Classroom 111 or 112 through the walls and turned left into the vestibule in front of those rooms.

121.    UPD radio broadcast that there was a shooter inside Robb Elementary School, that there was a shooting inside, and this was a "school shooting." (11:33 a.m.). The UPD broadcast channel was accessible to all the law enforcement officers in the area, including UCISD-PD, County, TXDPS, and federal officers. On information and belief, some or all UCISD-PD and TXDPS officers responding to the scene heard broadcasts herein alleged on the UPD channel.

122.    In Classroom 111, Teacher Arnulfo Reyes heard a bang. He put the classroom in lockdown. He told the children to get under the table and act like they were asleep. He saw shrapnel come through the sheetrock walls of his classroom.

123.    One of the teachers in Classroom 112, either Eva Mireles or Irma Garcia, said, "we're on severe lockdown." A student turned off the movie. A teacher in Classroom 112 told her students to hide, and they hid behind their teacher's desk, behind the backpacks, and under a table.

124.    The Shooter entered either Classroom 111 or 112. (Witnesses in the classrooms differ about which classroom was entered first, and the existing investigations are also inconclusive.)

125.    In Classroom 111, the students had hidden under a table so that they wouldn't be visible from the doorway.

126.    Teacher Reyes turned around and saw the Shooter. The Shooter fired at him. Reyes couldn't feel his arm, and fell to the floor, face down. The Shooter fired under the table, where children were. The Shooter kept firing into Classroom 111.

127.    Bleeding on the floor, Mr. Reyes thought, "somebody's going to come help us."

128.    **Defendant TXDPS Sergeant Juan Maldonado** arrived on scene. (11:34 a.m.).

129.    In Classroom 112, the Shooter said, "It's time to die."

130.    The teachers in Classroom 112 attempted to protect their students with their bodies, standing in front of the children as the Shooter fired. He approached one of the teachers and said, "goodnight." He shot her in the head.

131.    Both teachers were shot. Then the Shooter shot children and the whiteboard in Classroom 112.

132.    A UPD Sergeant approached the south doorway of the West building and transmitted over the radio, "Shots fired! Get inside! Go, go, go!" (11:35 a.m.). Gun smoke and a cloud of debris from drywall hung visibly in the hallway outside Classrooms 111 and 112. There were bullet holes in the walls and spent rifle casings on the floor.

133.    UPD and UCISD officers entered the building. They heard gunfire in Classrooms 111 and 112. They saw and smelled the gun smoke and drywall cloud. (11:35 a.m.). They knew this was an active shooter incident.

134.    Officers now inside the building included **Defendants UCISD-PD Officer Adrian Gonzales** and **UCISD-PD Chief Arredondo**.

135.    The Shooter fired another barrage of gunfire in Classrooms 111 and 112. (11:35 a.m.).

29

136.     The teacher in Classroom 106 heard screaming. Bullets came through the interior wall of her classroom, opposite Classroom 112.

## I.     DEFENDANT OFFICERS FROM THE TXDPS ARRIVE ON SCENE WITHIN TWO MINUTES OF THE SHOOTER ENTERING THE SCHOOL, WHILE THE SHOOTER IS SHOOTING INSIDE CLASSROOMS 111 AND 112

137.     **Defendant TXDPS Sergeant Juan Maldonado** arrived on scene within sixty seconds of the Shooter entering the West building. **Defendant TXDPS Trooper Elizondo** arrived on scene one minute after that. (11:35 a.m.).

138.     Unlike UPD and UCISD-PD responders, **Defendant Sergeant Maldonado and defendant Trooper Elizondo** represented the TXDPS. According to its own website, TXDPS is the "premier law enforcement agency" in the state of Texas, and "one of the finest in the nation." TXDPS total agency budget for the 2022 fiscal year was over $1.6 billion, of which $27,004,064 was allocated to the Texas Rangers alone. In comparison, the 2021-2022 budget for the **UCISD** had a total of $435,270 allocated to security and monitoring services, .03% of the TXDPS budget.

139.     TXDPS's mission is to "Protect and Serve Texas." TXDPS's role is to provide public safety capabilities that smaller law enforcement agencies in Texas either do not have or cannot sustain at the level and intensity needed. TXDPS's mandate includes responding to and taking responsibility over threats to public safety in Texas, including mass attacks in public places and individual radicalized violent actors. This role is crucial when active public safety threats occur in communities with smaller police departments that have less personnel and resources, like the active shooter incident at Robb Elementary School on May 24, 2022.

140.     Standards for TXDPS officers are high. Per TXDPS, "[a] Trooper must be educated, competent, and capable of handling every situation. A Trooper must be a problem-solver, a critical

thinker, and must work independently." TXDPS officers are trained in active shooter response under the ALERRT protocols and in SWAT tactics.

141.   At least 91 officers from TXDPS responded to the active shooter incident at Robb Elementary School on May 24, 2022.

142.   Police sergeants typically coordinate and control front line responses and investigations, allocating resources, directing activities, managing risk, and reviewing progress of investigations. **Defendant TXDPS Sergeant Maldonado** had supervisory authority over TXDPS troopers on scene.

## J.   DEFENDANT UCISD-PD OFFICERS RETREAT, TRAPPING STUDENTS AND TEACHERS WITH THE ACTIVE SHOOTER, WHILE DEFENDANT TXDPS OFFICERS HESITATE

143.   The Shooter began another barrage of gunfire inside the classrooms. (11:36 a.m.).

144.   On information and belief, although they could hear the active shooting inside the school, **Defendants TXDPS Sergeant Maldonado** and **TXDPS Trooper Elizondo** moved toward the school but hesitated outside.

145.   A child in Classroom 111 called 911 and whispered, "help me." She said she was in Room 111. Dispatch told the child to stay on the line. (11:36 a.m.).

146.   Officers approached Classrooms 111 and 112. These officers included **Defendants UCISD-PD Chief Arredondo** and **UCISD-PD Officer Adrian Gonzales.**

147.   On information and belief, **UCISD-PD Chief Arredondo** and **UCISD-PD Officer Gonzales** saw the classroom doors.



*Classroom 112's Door, with Broken Window Glass and Bullet Holes from the Shooter*

148.    As officers, including **Defendants Arredondo** and **Gonzales**, approached Classrooms 111 and 112, they also saw the bullet holes in the walls and the 5.56 NATO rounds on the floor. One officer said, "it's an AR. It's an AR."

149.    As they approached the classrooms, the Shooter continued firing. An officer suffered a graze on his ear from shrapnel and another officer received a minor graze wound.

150.    All officers on scene, including Defendants, knew that a subject had fired a weapon at a school, and he was an active shooter until neutralized. ALERRT doctrine required that officers on scene immediately isolate and neutralize the Shooter in order to stop the killing and stop the dying.

151.    Officers, including **Defendants Arredondo** and **Gonzales**, rejected ALERRT doctrine. They stopped and then retreated. (11:36 a.m.). They abandoned wounded children and teachers in Classrooms 111 and 112, who remained locked down and still waiting for first responders to open the door.

152.    The officers took positions at either end of the hallway, "containing" the Shooter so he could not escape from Classrooms 111 and 112.

153.    Their actions trapped the locked down students and teachers in Classroom 111 and 112 with the active shooter.

154.    **Defendant TXDPS Trooper Elizondo** was on the east side of the building and heard the gunfire inside the school. (11:36 a.m.).

155.    **Defendant TXDPS Sergeant Maldonado** was at the north hallway entrance by 11:37 a.m. He understood that the Shooter was in the building, and in a classroom. Another officer told **Defendant Maldonado** they had to go in because the Shooter was shooting in a classroom. In violation of ALERRT doctrine, **Defendant Maldonado** signaled that officers in the hallway should wait because "DPS is sending people."  (11:37 a.m.).

156.    The Shooter fired approximately three more shots. (11:37 a.m.).

157.    A Uvalde Police officer reported, "we have him contained." (11:37 a.m.).

158.    In a phone call to dispatch, **Defendant UCISD-PD Chief Arredondo** said, "we don't have enough fire power right now it's all pistol and he has an AR15."

159.    Every single officer on scene, including all Defendants on scene, knew that this was an active shooter; and knew or disregarded an excessive risk that children and teachers in the West building were the Shooter's targets, and that some of those children and teachers must already be hit. Every single officer knew and understood that by prolonging the confinement of West building's students and teachers with the Shooter, they were very likely harming and endangering those students and teachers. Regardless, the officers, including **Defendants TXDPS Sergeant Maldonado, TXDPS Trooper Elizondo, UCISD-PD Chief Arredondo** and **UCISD-PD Officer**

33

**Gonzales** confined the Shooter in Classrooms 111 and 112 and continued the lockdown of students and teachers in those classrooms.

**K.     THE UVALDE COUNTY DISTRICT ATTORNEY'S OFFICE ALERTS DEFENDANT TXDPS RANGER KINDELL ABOUT THE ACTIVE SHOOTING**

160.     On the morning of May 24, 2022, **Defendant Ranger Kindell** was working from home. He received a call from the Uvalde County District Attorney's Chief Investigator alerting him about a possible active shooter incident.

161.     The District Attorney's Investigator's call to **Defendant Ranger Kindell** was no accident. Rangers are an elite division of the Texas Department of Public Safety. Of the thousands of law enforcement officers in the state of Texas, only 166 are commissioned Rangers. "A Ranger is an officer who is able to handle any given situation without definite instructions from his commanding officer or higher authority," according to the Ranger's website. Texas Rangers have jurisdiction everywhere and anywhere in Texas.

162.     **Defendant Ranger Kindell** had twenty years of experience as a TXDPS officer, as well as rapid response training and training on how to teach civilians to respond to active shooters.

163.     **Defendant Ranger Kindell** had the authority to exercise de facto supervisory authority over TXDPS, UPD, UCISD and County law enforcement officers.

164.     **Defendant Ranger Kindell** called a UPD Sergeant who was on scene to get more information. The UPD Sergeant told **Defendant Kindell** that the Shooter was shooting in the classroom and requested shields, equipment, and rifles. On information and belief, **Defendant Kindell** did not direct the UPD Sergeant to immediately follow ALERRT protocols to isolate and neutralize the Shooter. Instead, **Defendant Kindell** indicated that it was acceptable to wait until more resources arrived before engaging the Shooter.

**L.     OFFICERS, INCLUDING DEFENDANTS, KNEW THERE WERE STUDENTS AND TEACHERS IN CLASSROOMS 111 AND 112 AND THEY KEPT THOSE STUDENTS AND TEACHERS TRAPPED WITH THE SHOOTER**

165.     Teacher, **Deceased Plaintiff Eva Mireles,** was lying wounded on the floor of Classroom 112. Her students saw her bleeding. She managed to call her husband, UCISD-PD Officer Rubin Ruiz. She told him she was shot. UCISD-PD Officer Ruiz told multiple officers that the shooting was happening in his wife's classroom. (11:37 a.m.)

166.     All officers in the northside hallway heard, knew and understood that there was a teacher locked down in the classrooms with the Shooter. Regardless, they continued to confine students and teachers in Classrooms 111 and 112 with the active shooter.

167.     A UPD Sergeant repeated, "we have got to get in there."

168.     A Border Patrol Agent arrived and positioned himself along the wall at the T intersection at the north end of the hallway. (11:38 a.m.).

169.     **Defendant TXDPS Captain Joel Betancourt** obtained confirmation that that there was a shooting at Robb Elementary School and headed there.

170.     An officer commented over the radio "I have a male subject with an AR." (11:39 a.m.).

171.     The UPD Acting Chief radioed for "any agency available" to come out and help. (11:39 a.m.).

172.     In classroom 102, a teacher called 911. She said they were locked down in the classroom and that she believed someone was shot in another classroom in the building. (11:40 a.m.).

173.   UPD radio broadcasted, "Male subject is still shooting." On information and belief, **Defendant TXDPS** and **UCISD-PD Officers** at the scene and responding to the scene heard this transmission. (11:41 a.m.).

174.   Emergency medical responders arrived in front of the school. (11:41 a.m.).

175.   **Defendant TXDPS Trooper Elizondo** finally entered the West building. She had previously been standing outside of the doorway (11:41 a.m.).

176.   A teacher in Classroom 102 texted her husband, a Border Patrol Agent: "There's an active shooter. Help. Love you." (11:41 a.m.).

177.   UPD radio broadcasted that there was a possible gunshot victim in a classroom. (11:41 a.m.). On information and belief, **TXDPS Defendant** and **UCISD-PD Defendant** officers at the scene and responding to the scene heard this transmission. They knew that they had trapped the Shooter with the victim and cut her off from help, and that they were continuing her entrapment without medical assistance.

178.   Family members of children started arriving, congregating near a funeral home across Geraldine Avenue from Robb Elementary School's West building. Law enforcement officers, however, created a perimeter and prevented those parents from coming through to the West building. (11:41 a.m.)

179.   UPD radio broadcast that class in Classroom 112 "should be in session right now … the class should be in session right now." (11:42 a.m.). On information and belief, **TXDPS Defendant and UCISD-PD Defendant** officers at the scene and responding to the scene heard this broadcast. This broadcast confirmed what many already understood – that they had trapped the Shooter with students and teachers in Classrooms 111 and 112, and that the decisions of the officers on site were keeping those students and teachers locked down with the Shooter.

180.     **Defendant TXDPS Trooper Elizondo** was present in the West building. (11:42 a.m.).

181.     A girl in Classroom 112 said something. She may have said, "Officers, help us." The Shooter heard her. He walked over to her and shot her. (The timing of this shot cannot yet be alleged, although it seems likely it was the shot at 11:44 a.m.).

182.     All officers inside and outside the West building heard a shot. (11:44 a.m.).

183.     An unknown law enforcement officer at the northwest entrance said that the Shooter was in a classroom "with kids." (11:45 a.m.).

184.     The Shooter sat at Teacher Arnulfo Reyes' desk in Classroom 111. Sometimes he kicked children's bodies and mocked them. He dropped Teacher Reyes' cell phone on his back and dribbled water on him to see if he would move.

## M.     OFFICERS, INCLUDING DEFENDANTS, STOP PARENTS FROM RESCUING THE CHILDREN TRAPPED INSIDE CLASSROOMS 111 AND 112

185.     As the incident progressed, parents learned of the danger to their children. They came to the school, where law enforcement had set up a perimeter. Parents begged the officers to save their children. Then parents tried to save their children themselves. Officers physically restrained parents and family members from getting closer to the school.

186.     Parents told law enforcement officers kids were inside. (11:46 a.m.). Parents told officers, "Either you go in or I'm going in."

187.     When parents tried to break through the law enforcement perimeter, law enforcement officers, including TXDPS and Uvalde County Sheriff's Office ("UCSO") officers stopped them.

188.    One man surrounded by law enforcement officers was knocked down. As he lay on his back on the ground, at least two **TXDPS Doe Defendant officers** stood over him and prevented him from getting up, while several officers in the immediate vicinity watched.

189.    One parent attempting to reach her children was handcuffed and another was tasered by a law enforcement officer.

190.    The officers' conduct was cruel. **Defendant Trooper Elizondo** later admitted, "If my son had been in there, I would not have been outside. I promise you that." And yet officers stopped parents, ensuring that parents could not reach their children.

## N.    OFFICERS SAVED THEMSELVES, NOT CHILDREN, FROM THE SHOOTER'S LETHAL BATTLE RIFLE

191.    The Shooter was armed with a Daniel Defense DDM4v7, an AR-15 style rifle, and multiple high-capacity 30-round magazines containing NATO 5.56 cartridges.

192.    ALERRT doctrine makes no exceptions for AR-15s. AR-15 style rifles are renowned for the size and severity of the wounds they produce and the likelihood that the rounds they fire will pierce body armor, walls, and other barriers. The command to "stop the killing, stop the dying" is even more urgent when an active shooter is using an AR-15.

193.    The AR-15's presence and power could be felt from the first moment officers entered the West building. 5.56 NATO rounds from the Shooter's AR-15 had penetrated the classroom walls into the hallway. Officers noted that the Shooter had an AR-15 at 11:36 a.m.

194.    A UPD Sergeant got on his radio to warn others. "I have a male subject with an AR," he said. "Fuck," an officer replied, "AR," another exclaimed, alerting others nearby.

195.    The presence of the lethal AR-15 paralyzed the response. A UPD officer commented later, "I knew too it wasn't a pistol. ... I was like, 'Shit, it's a rifle,'" he said. He added, "The way he was shooting, he was probably going to take all of us out." Officers reasoned there

was "no way" to take action, and the only thing they could do was wait. One UPD Sergeant said, "You knew that it was definitely an AR.... There was no way of going in.… We had no choice but to wait and try to get something that had better coverage where we could actually stand up to him." ALERRT doctrine utterly rejects this excuse for delay. In an active shooter incident, the only choice is immediate isolation and neutralization of the shooter, because that is the only action that stops the killing and stops the dying.

196.   Officers did not want to move forward until they had rifle-rated shields. A UPD Lieutenant later said, "[you] can only carry so many ballistic vests on you. That .223 (caliber) round would have gone right through you." **Defendant UCISD-PD Chief Arredondo said he** "need[ed] lots of firepower" because of the Shooter's AR-15.

197.   **Defendant TXDPS Sergeant Maldonado** was with troopers outside the West building. He said, "This is so sad dude…. He shot kids bro." Officers standing with him discussed that they knew this was something that needed to be done "now" and "ASAP." **Defendant TXDPS Officer Richard Bogdanski** asked, "You know what kind of gun?" and an officer responded "AR, he has a battle rifle." "What's the safest way to do this? I'm not trying to get clapped out," **Defendant Bogdanski** replied.

198.   These same officers knew that the Shooter had used his AR-15 to unleash barrages of fire on teachers and students. Every minute that officers waited on rifle-rated shields, "lots of firepower," and even aerial support, children and teachers faced the Shooter with no protection at all.

## O.   OFFICERS, INCLUDING DEFENDANTS, ARE INDIFFERENT TO THE FACT THAT A TEACHER IS DYING INSIDE CLASSROOM 112

199.   Three Border Patrol agents entered through the northwest door carrying ballistic shields and other equipment. (11:51 a.m.).

200.    Although he knew students and teachers were confined with the active Shooter in Classrooms 111 and 112 and had heard the Shooter fire repeatedly, **Defendant UCISD-PD Chief Arredondo** intended to "start negotiations" with the Shooter. (11:55 a.m.).

201.    Officer Ruiz tried again to save his wife and the students who were with her. He told officers in and around the West building that his wife, a teacher in Classroom 112, had been shot. Officers were indifferent to teacher Eva Mireles' plight. They stopped Officer Ruiz from entering Classrooms 111 and 112, took his weapon and escorted him out the door. (11:56 a.m.).

202.    Inside the West building, **Defendant TXDPS Special Agent Luke Williams** was in the hallway outside of one of the classrooms with two other **Doe Defendant TXDPS officers.** (11:57 a.m.).

203.    While driving to Robb Elementary School, **Defendant TXDPS Captain Betancourt** spoke with a Uvalde County Sherriff for updates.

204.    By 11:59 a.m., at least eight TXDPS officers and at least seven Border Patrol Agents and one US Marshal had been in or were currently inside of the West building.

205.    **Defendant Ranger Kindell** arrived on scene. He was told that the Shooter was inside Classrooms 111 and 112. (11:59 a.m.).

206.    **Defendant UCISD-PD Chief Arredondo** again attempted to negotiate with the Shooter from the hallway. (11:59 a.m. – 12:01 p.m.).

207.    Inside classroom 111, Teacher Arnulfo Reyes heard the police speaking to the Shooter and attempting to negotiate.

208.    **Doe Defendant TXDPS Sergeant** outside of the northwest entrance of the West building stated that that the Shooter shot kids. (12:02 p.m.).

209.    A child in classroom 112 called 911. The child pleaded for help. The call lasted one minute. (12:03 p.m.).

210.    Officers evacuated children from some classrooms in the West building. Like the children in Classrooms 111 and 112, those children and teachers had stayed still and silent, waiting for first responders to open the door, just exactly as the lockdown drill requires.

211.    **Defendant Ranger Kindell** ordered that TXDPS send all troopers available to assist with crowd control. (12:06 p.m.).

212.    Parents were moving toward the northwest corner of the school. Some were armed. Officers stopped them. (12:07 p.m.).

## P.    MIAH CERRILLO CALLS 911 FROM INSIDE CLASSROOM 112 AND OFFICERS ARE INDIFFERENT TO HER CRY FOR HELP

213.    In Classroom 112, **Miah Cerrillo** had covered herself in her friend's blood so the Shooter would believe she was dead.

214.    **Miah** and her friend knew some of the wounded in Classroom 112 were running out of time. They had watched one of their classmates be shot as she tried to call 911. But their teacher, **Deceased Plaintiff Eva Mireles**, was dying. They quietly took a teacher's phone and called 911. (12:10 p.m.).

215.    On information and belief, **Defendant Ranger Kindell** told other officers that he had someone in the building who would handle going into the classrooms.

216.    On information and belief, the UPD Acting Chief deferred to **Defendant Ranger Kindell**, understanding that he had taken command. (12:10 p.m.). Other UPD officers did the same. (12:11 p.m.).

217.    UPD radio broadcasted that a child had called 911 and was in a room full of victims. This transmission was heard on both sides of the hall and outside the building. (12:12 p.m.).

218.   The BORTAC Commander, who was now inside the building, was told that there were victims inside Classrooms 111 and 112. (12:13 p.m.).

219.   Officers prolonged the lockdown looking for keys (which they did not need because the door to Classroom 111 was not locked). (12:13 p.m.).

220.   **Miah** and her friend whispered to the 911 dispatcher that their teacher was still alive and needed help. They asked for help. (12:13 p.m.).

221.   Dispatch alerted officers in the West building. The UPD Acting Chief said, "a child just called. They have victims in there. Called 911." (12:13 p.m.).

222.   The children in Classroom 112 were trying to keep quiet, but some were wounded, and they were all terrified. One teacher was dead, and one was dying. There was no one to help them stay quiet. **Miah** and her friend told 911, "send an ambulance right away." (12:14 p.m.).

223.   They said to please hurry. Their teacher was about to die. (12:15 p.m.). They asked, should they open the door? They were trying to save their teacher's life. They knew she needed help. Dispatch told them to stay quiet. They said that their teacher wouldn't stay quiet. (12:16 p.m.).

224.   Dispatch said they are sending officers, but no help came. (12:17 p.m.).

225.    **Miah** and her friend said officers need to come now, but no one came. (12:18 p.m.).

226.   Dispatch continued to tell them not to open the door. (12:19 p.m.).

227.   The Shooter was in Classroom 111. He shot Teacher Arnulfo Reyes in the back. Then he shot at the children under the table again. On information and belief, a round struck **Jacklyn Cazares** directly.

228.   In Classroom 112, **Miah** and her friend were still on the phone with 911 dispatch. They said, "he's shooting." Dispatch told them to stay quiet. (12:21 p.m.).

229.    Defendant officers heard the shots. They already knew children and a teacher were alive and trapped inside; now they knew he was shooting at them again.

230.    On the south side of the hallway, **Defendant UCISD–PD Chief Arredondo** continued to try to negotiate with the Shooter, "can you hear me, sir? Can you hear me, sir?" (12:21 p.m.).

231.    **Defendant Texas Ranger Kindell** heard the gunfire. He had been on scene for 24 minutes. He was now in the West building, also planning to negotiate with the Shooter, in direct violation of ALERRT protocols. On information and belief, he knew negotiation would continue to trap students and teachers who were still alive in Classrooms 111 and 112 with the Shooter. (12:23 p.m.).

232.    Officers continued to try to find a key that would work on the doors to Classroom 111 and 112, even though the door to Classroom 111 was unlocked. (12:23 p.m.).

233.    A BORSTAR medic said to officers in and near the West building, "the victims have been bleeding for a while." (12:24 p.m.). Officers still did not permit the medic to approach Classrooms 111 and 112.

234.    An officer said, "There's a teacher shot in there." Another officer responded, "I know." (12:27 p.m.).

235.    **Defendant TXDPS Captain Betancourt** arrived on scene. (12:30 p.m.).

236.    Twenty-one minutes elapsed, while officers, including **Defendant Ranger Kindell** and all **TXDPS Defendants** and **UCSID-PD Defendants** continued to contain the Shooter with living children and teachers in Classrooms 111 and 112.

237.    On the radio, **Defendant TXDPS Captain Betancourt** said "Hey, this is DPS Captain Betancourt. The team that's going to make breach needs to stand by. The team that's gonna breach needs to stand by." (12:48 p.m.).

238.    Finally, at 12:49 p.m. – over 73 minutes since officers first confined the Shooter with the students and teachers in Classrooms 111 and 112 – a team lead by the BORTAC Commander opened the door to Classroom 111, ending the lockdown. (12:49 p.m.). The Shooter was killed, and no one on the entry team was seriously injured. (12:50 p.m.).

## Q.    OFFICERS' DECISION TO CONTAIN THE SHOOTER WITH HIS VICTIMS CAUSED CHILDREN TO SUFFER AND DIE

239.    Officers, including **Defendants TXDPS Sergeant Maldonado, TXDPS Trooper Crimson Elizondo, UCISD–PD Chief Arredondo,** and **UCISD–PD Officer Gonzales**, were on scene by 11:35 a.m., while the Shooter was firing in Classrooms 111 and 112. **Defendant Kindell** was told this was an active shooter incident at approximately 11:35 a.m., acted in a supervisory capacity from that moment forward, and arrived on scene at 11:59 a.m.

240.    At 11:36 a.m., officers approached Classrooms 111 and 112 to breach the doors. When the Shooter fired and two officers were hit by shrapnel, they retreated instead of isolating and neutralizing the Shooter. Their actions contained the Shooter in the same two rooms as his victims for 73 minutes.

241.    The Defendants' actions gave the Shooter leisure to torture and traumatize his victims. Children watched the Shooter tell classmates, "It's time to die," and shoot them. Using the victims' blood as ink, the Shooter wrote "LOL," on the whiteboard in Classroom 111. On information and belief, the Shooter mocked wounded children and kicked them to see if they were dead.

242.    During those 73 minutes, the Shooter fired 19 more times: eleven shots over 53 seconds at 11:36 a.m.; three shots at 11:37 a.m.; one shot at 11:44 a.m.; and four shots at 12:21 p.m.

243.    One of those shots was fired at close range into teacher Arnulfo Reyes' back, as he lay prone on the floor in Classroom 111.

244.    On information and belief, one shot fatally wounded **Deceased Plaintiff Eva Mireles** who otherwise would have survived.

245.    On information and belief, the remaining 17 shots were aimed at children, including the **Deceased Plaintiff Eva Mireles**.

246.    In addition to enabling the Shooter to fire 19 rounds at his victims at close range, Defendants' actions denied wounded victims, including the **Deceased Plaintiff Eva Mireles** crucial medical care.

247.    On information and belief, earlier medical intervention could have saved **Deceased Plaintiff Eva Mireles**.

248.    **Deceased Plaintiff Eva Mireles** died while the Shooter terrorized her.

## R.    PLAINTIFFS HAVE RECEIVED LITTLE TRANSPARENCY AND NO ACCOUNTABILITY

249.    Plaintiffs are grieving an unimaginable loss. Responding law enforcement officers' betrayal of their children's trust – and theirs – increased their suffering exponentially. The officers and departments that failed these children owe plaintiffs complete transparency and full accountability, and again they have failed these families. To date, they have provided little transparency and no accountability.

250.    Each responding law enforcement agency, including the TXDPS, has some or all of the following records that show exactly what was done by whom on May 24, 2022: body camera

45

footage, recordings of radio communications, dispatch transmission recordings and logs, and recorded and/or written statements of responding officers and victims.

251.    TXDPS has acknowledged that complete transparency is the right thing to do. Facing early public outrage about the law enforcement response, TXDPS Director McCraw promised, "When we get the ability to come talk to you, I'll go line by line in terms of what trooper did what …. what DPS officer. We'll be entirely transparent," and "[t]he public will have it – they'll have excruciating details in terms of what we did, when we did it and those gaps."

252.    TXDPS has broken its promise of transparency. In the almost two years since the shooting, the TXDPS has fought in court to conceal its body camera footage and radio traffic from Uvalde's victims and the public.

253.    The Texas Rangers investigated the response to the shooting, including the actions of the 91 responding TXDPS officers.

254.    In August 2022, the Texas Rangers asked Dr. Mark Escott, Medical Director for TXDPS and Chief Medical Officer for the City of Austin, to look into the injuries of the victims and determine whether any victims could have survived. The request was apparently a delaying tactic, not a search for the truth. Dr. Escott was never given access to autopsy reports or hospital and EMS records. A year later, the Rangers told Dr. Escott they were "moving in a different direction" and no longer wanted the analysis to be performed.

255.    The TXDPS delivered a final report to the Uvalde County District Attorney so that she could determine whether to press charges. The TXDPS chose not to make that report public.

256.    The Uvalde County District Attorney has provided the TXDPS with another means to delay and avoid transparency. The District Attorney refuses to release crime scene photos,

ballistics analysis, autopsies, and other information that would enable Plaintiffs to allege with greater specificity what happened in Classrooms 111 and 112.

257.    Nor has the TXPDS held any of its officers fully to account for their actions. Minutes of a state police captains' meeting document Director McCraw as telling his officers, "No one is going to lose their jobs" for their conduct during the shooting.

258.    **Defendant Kindell** was suspended in September 2022 for failing to perform his duties and was issued a preliminary termination letter by TXDPS Director McCraw in January 2023. **Defendant Kindell** was given the opportunity to meet with McCraw before the termination decision was finalized, but according to a TXDPS spokesperson, that meeting will not occur until the grand jury has made a decision on criminal charges. **Defendant Kindell** continues to draw a Ranger's salary.

259.    **Defendant Elizondo** resigned from TXDPS while under investigation for actions inconsistent with training and Department requirements in connection with her response at Robb Elementary on May 24, 2022.

260.    **Defendant Maldonado** was served termination papers by TXDPS in October 2022 following an investigation into his actions at Robb Elementary on May 24, 2022. TXDPS did not disclose the grounds for his termination. TXDPS ultimately did not terminate **Defendant Maldonado** and allowed him to retire instead.

261.    **Defendant Betancourt's** actions at Robb Elementary on May 24, 2022, were investigated by TXDPS, but he remains employed with the agency.

262.    To date, not one person from TXDPS has been fired in connection with their response to the shooting at Robb Elementary on May 24, 2022.

263.    A total of 376 law enforcement officers had responded to the active shooter incident at Robb Elementary School: 91 TXDPS officers, 26 officers from the UPD, 179 officers from federal agencies, county sheriffs and constables from Uvalde and elsewhere, and the five UCISD-PD officers.

## V.    FIRST CAUSE OF ACTION: ALL PLAINTIFFS AGAINST TXDPS DEFENDANTS AND INDIVIDUAL UCISD-PD DEFENDANTS, VIOLATION OF 42 U.S.C. § 1983 (VIOLATION OF FOURTEENTH AMENDMENT, SUBSTANTIVE DUE PROCESS CLAUSE/SPECIAL RELATIONSHIP)

264.    Plaintiffs re-allege and incorporate by reference each of the preceding paragraphs and all subsequent paragraphs as though fully restated herein.

265.    The **TXDPS Defendants** and individual **UCISD-PD Defendants** responded to an active shooter incident at a school.

266.    On information and belief, and as previously alleged, these Defendants knew even before they arrived on scene that this was an active shooter incident, and that their duty was to neutralize the Shooter immediately.

267.    Defendants knew that the students and teachers in all classrooms at Robb Elementary School – including Classrooms 111 and 112 – were required to and would follow lockdown procedures and that those lockdown procedures required those children and teachers to remain in their classrooms until authorized by law enforcement personnel to leave.

268.    When Defendants arrived on scene, they took control of the physical location of the Shooter and the children and teacher who were his victims. They confined the Shooter to Classrooms 111 and 112. They confined three teachers and thirty students with him.

269.    Each Defendant knew that the **Deceased Plaintiff Eva Mireles** was unable to provide for their own safety when confined to a classroom with an active shooter carrying an AR-15.

270.     Defendants also set up and enforced a perimeter around the school.

271.     Each Defendant knew and intended that this law enforcement perimeter would prevent parents from reaching their children inside Robb Elementary School.

272.     Medics arrived on scene to provide life–saving care for those wounded by the Shooter.

273.     Each Defendant knew that their actions were delaying needed medical care from reaching the wounded in Classrooms 111 and 112.

274.     For any and all of these reasons and as previously alleged, the **Deceased Plaintiff Eva Mireles** was in the custody of Defendants. Again, state-mandated lockdown drills required children to remain in the classroom until authorized to leave by law enforcement officers. Following those drills, children stayed still and silent. Finally, in desperation, they called 911 and begged for help and permission to leave and were told by dispatchers to remain in place. Parents were not permitted to provide protection to their children either. Law enforcement officers ensured through their actions that no person would be permitted to rescue or protect the children and their teachers other than law enforcement officers.

275.     Each Defendant knew that students and teachers in Classrooms 111 and 112 were confined with the Shooter, unable to provide for their own safety, and cut off from receiving assistance from their parents, medics or anyone but law enforcement. Thus, each Defendant knew students and teachers in Classrooms 111 and 112 were in their custody.

276.     While in Defendants' custody, the **Deceased Plaintiff Eva Mireles** had constitutional rights to be free from bodily harm, abuse, and psychological torture.

277.     Each Defendant violated those rights of the **Deceased Plaintiff Eva Mireles**.

278.     Each Defendant acted with deliberate indifference to the plight of the **Deceased Plaintiff Eva Mireles**.

279.     Each Defendant knew and understood that the longer locked down children and teachers remained trapped with the Shooter, the more students and teachers were likely to die, either because the Shooter would find them and shoot them, or because they would succumb to wounds that he had already inflicted.

280.     The known and obvious consequences of each Defendant's actions were that the students and teachers in their custody would be shot, deprived of life-saving medical care, and terrorized by the Shooter.

281.     In carrying out these actions, these Defendants acted with disregard for the known and obvious consequences of their actions.

282.     These actions by the **TXDPS Defendants** and individual **UCISD–PD Defendants** resulted in the death, wounding, and/or psychological terror of the **Deceased Plaintiff Eva Mireles**.

283.     If these Defendants, or any one of them, had acted to protect the reasonable safety of the **Deceased Plaintiff Eva Mireles**, she would not have died.

284.     If these Defendants, or any one of them, had acted to protect the reasonable safety of the **Deceased Plaintiff Eva Mireles**, she would have been spared the emotional torture of being in their classrooms with the Shooter waiting for help that did not come.

285.     Further, had parents been able to reach the West building, they or law enforcement officers would have breached the classrooms and neutralized the Shooter well before 12:49 p.m., and emergency personnel would have been able to enter the classrooms and provide emergency medical services to wounded children and **Deceased Plaintiff Eva Mireles**.

286.    If such intervention had occurred, **Deceased Plaintiff Eva Mireles** would not have died.

287.    If parents had breached the classrooms, they would have been able to comfort **Deceased Plaintiff Eva Mireles** who was wounded and possibly dying. Instead, **Deceased Plaintiff Eva Mireles** died terrified and without comfort.

288.     If parents had breached the classrooms, **Deceased Plaintiff Eva Mireles** would have been spared emotional torture and trauma.

289.     Further, these actions by the **TXDPS Defendants** and the individual **UCISD-PD Defendants** deprived the **Parents** of the right to protect their children from the active shooter and to aid and comfort one or more of the children and **Deceased Plaintiff Eva Mireles**.

290.    As a direct and proximate result of these police actions, Plaintiffs sustained the damages hereinafter alleged.

## VI.    SECOND CAUSE OF ACTION: ALL PLAINTIFFS AGAINST TXDPS DEFENDANTS AND INDIVIDUAL UCISD-PD DEFENDANTS, VIOLATION OF 42 U.S.C. § 1983 (SUBSTANTIVE DUE PROCESS, STATE CREATED DANGER)

291.    Plaintiffs re-allege and incorporate by reference each of the preceding paragraphs and all subsequent paragraphs as though fully restated herein.

292.    The **TXDPS Defendants** and the individual **UCISD-PD Defendants** created an environment dangerous to the **Deceased Plaintiff Eva Mireles**.

293.     These Defendants knew the environment was dangerous to the **Deceased Plaintiff Eva Mireles**.

294.    These Defendants created an opportunity that would not have otherwise existed for the Shooter to harm **Deceased Plaintiff Eva Mireles**.

295.    These Defendants' actions caused the **Deceased Plaintiff Eva Mireles** to be exposed to acts of violence by the Shooter, and increased the risk that the **Deceased Plaintiff Eva Mireles** would be exposed to such acts of violence.

296.    These Defendants' actions placed the **Deceased Plaintiff Eva Mireles** specifically at risk.

297.    These Defendants knew or should have known that their actions were specifically endangering students and teachers in Classrooms 111 and 112, including the **Deceased Plaintiff Eva Mireles**.

298.    The harm to the **Deceased Plaintiff Eva Mireles** caused by these Defendants' actions was foreseeable and direct.

299.    The known and obvious consequences of each of these Defendant's actions was that the students and teachers including **Deceased Plaintiff Eva Mireles** in their custody would be shot, deprived of life–saving medical care, and terrorized by the Shooter.

300.    In carrying out these actions, these Defendants acted with disregard for the known and obvious consequences of their actions to the children and teachers including **Deceased Plaintiff Eva Mireles**.

301.    Each Defendant's actions caused the death, wounding, and/or psychological torture and trauma to one or more of the **Deceased Plaintiff Eva Mireles**.

302.    As a direct and proximate result of these police actions, Plaintiffs sustained the damages hereinafter alleged.

**VII.    THIRD CAUSE OF ACTION: ALL PLAINTIFFS AGAINST TXDPS DEFENDANTS AND INDIVIDUAL UCISD-PD DEFENDANTS, VIOLATION OF 42 U.S.C. § 1983 (VIOLATION FOURTH AMENDMENT, UNLAWFUL SEIZURE)**

303.     Plaintiffs re-allege and incorporate by reference each of the preceding paragraphs and all subsequent paragraphs as though fully restated herein.

304.     By using force and authority to involuntarily confine students and teachers inside Classrooms 111 and 112 with the active Shooter, the **TXDPS Defendants** and individual **UCSID-PD Defendants** seized the **Deceased Plaintiff Eva Mireles**, in violation of clearly established rights secured to them by the Fourth and Fourteenth Amendments.

305.     Each of these Defendants was deliberately indifferent to the rights of the **Deceased Plaintiff Eva Mireles**.

306.     As a direct and proximate result of the misconduct of these Defendants as described herein, the Plaintiffs sustained the damages hereinafter alleged.

**VIII.   FOURTH CAUSE OF ACTION: ALL PLAINTIFFS AGAINST DEFENDANT ARREDONDO IN HIS OFFICIAL CAPACITY, UVALDE CONSOLIDTED INDEPENDENT SCHOOL DISTRICT, VIOLATION OF 42 U.S.C. § 1983 (VIOLATION FOURTH AND FOURTEENTH AMENDMENTS, FAILURE TO TRAIN/CREATION OF POLICY)**

307.     Plaintiffs re-allege and incorporate by reference each of the preceding paragraphs and all subsequent paragraphs as though fully restated herein.

308.      **Defendant Arredondo** in his official capacity and **Defendant UCISD** are hereafter referred to as "the **Policy-Making Uvalde Defendants**."

309.     Despite clear national standards for active shooter incidents, the **Policy-Making Uvalde Defendants** failed to ensure that their officers were adequately trained and failed to develop meaningful plans to address an active shooter incident.

310.     This lack of training and egregious delay demonstrated deliberate indifference to the Fourth and Fourteenth Amendment rights of students and teachers who would be locked down during an active shooter event including the rights of Plaintiffs.

311.    The **Policy-Making Uvalde Defendants** failed to adequately train, supervise, and discipline the individual **UCISD-PD Defendants** regarding how to identify and respond to an active shooter incident. The result was that individual **UCISD-PD Defendants** and **TXDPS Defendants** violated the clearly established rights secured to them by the Fourth and Fourteenth Amendments as previously alleged.

312.    **Defendant Arredondo**, as Chief of Police for the UCISD-PD, was a final policymaker for the **UCISD** with regard to the tactics, arrests, and training of UCISD-PD officers at all relevant times herein.

313.    **Defendant Arredondo**, acting as final policymaker, adopted an on-scene policy that was the exact opposite of "stop the killing and then stop the dying" and all other written active shooter policies. His policy was to confine the students and teachers inside two classrooms with the Shooter, depriving them of emergency medical care and preventing rescue by their loved ones.

314.    By virtue of any and all of these actions and omissions, the **Policy-Making Uvalde Defendants** were deliberately indifferent to the constitutional rights of the **Deceased Plaintiff Eva Mireles**.

315.    As a direct and proximate result of these actions and inactions, Plaintiffs sustained the damages alleged herein.

IX.    <u>**FIFTH CAUSE OF ACTION: ALL PLAINTIFFS AGAINST DEFENDANT ARREDONDO IN HIS OFFICIAL CAPACITY, UVALDE CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, VIOLATION OF 42 U.S.C. § 1983 (FOURTEENTH AMENDMENT SPECIAL RELATIONSHIP AND STATE CREATED DANGER, FAILURE TO TRAIN/CREATION OF POLICY)**</u>

316.    Plaintiffs re-allege and incorporate by reference each of the preceding paragraphs and all subsequent paragraphs as though fully restated herein.

317.    The **Policy-Making Uvalde Defendants** failed to adequately train, supervise, and discipline the Law Enforcement Individual Defendants regarding how to identify and respond to an active shooter incident. The result was that law enforcement officers employed by **Policy-Making Uvalde Defendants** confined the students and teachers with the Shooter and illegally created a dangerous environment for the students and teachers, as previously alleged. Further, the the students and teachers were in the custody of law enforcement officers, as previously alleged.

318.    **Defendant Arredondo**, acting as final policymaker, adopted a policy of confining the Child Plaintiffs with the active shooter and increasing the danger to them as previously alleged.

319.    By virtue of these actions and omissions, the **Policy-Making Uvalde Defendants** were deliberately indifferent to the constitutional rights of the **Deceased Plaintiff Eva Mireles**.

320.    As a direct and proximate result of these actions, omissions and policies, the **Deceased Plaintiff Eva Mireles** sustained the damages alleged herein.

## X.      SIXTH CAUSE OF ACTION: ALL PLAINTIFFS AGAINST MOTOROLA SOLUTIONS, INC., PRODUCTS LIABILITY – FAILURE TO WARN

321.    Plaintiffs re-allege and incorporate each of the preceding paragraphs, and all subsequent paragraphs.

322.    Plaintiffs bring this strict liability claim against **Defendant Motorola** for failure to warn of the dangers and risks associated with use of its products.

323.    **Motorola's** products were defective and unreasonably dangerous because they did not contain adequate warnings or instructions concerning failure during normal use. These actions were under the ultimate control and supervision of **Motorola**.

324.    **Motorola's** products are used for public safety and in public settings and **Motorola** had a duty to warn of the risks of failure associated with the reasonably foreseeable use of the products and a duty to instruct on the proper and safe use of these products.

325.     At all relevant times, **Motorola** had a duty to properly research, test, develop, manufacture, inspect, label, market, promote, provide proper warnings, and take such steps as necessary to ensure that its products did not fail during an emergency causing others to suffer unreasonable and dangerous risks and harm. **Motorola** had a continuing duty to instruct on the proper, safe use of these products, especially given that the products were used by schools and first responders. **Motorola**, as the designer, manufacturer, seller, or distributor, is held to the knowledge of an expert in the field.

326.     **Motorola** could have provided warnings or instructions regarding the full and complete risks of its products because it knew or should have known of the unreasonable risks of harm associated with the use of products and/or failure during use.

327.     **Motorola** failed to properly investigate, study, research, test, manufacture, and label their products and failed to minimize the dangers to others due to product failures. **Motorola** knew failing to do so would be catastrophic and prevent schools and first responders from protecting victims such as the **Deceased Plaintiff Eva Mireles** during an attack.

328.     **Motorola's** products reached its intended users without substantial change in their condition as designed, manufactured, sold, distributed, labeled, implemented, and sold by Defendants.

329.     As a result of **Motorola's** failures to warn, Motorola's products were defective and unreasonably dangerous when they left the possession and/or control of **Motorola** and were used by its consumers on the day of the school shooting. That defect was a producing cause of the injuries made the basis of this suit.

330.     **Motorola** is liable for the physical harms caused in this case, and Plaintiffs plead for all of their damages as set forth below.

## XI. SEVENTH CAUSE OF ACTION: ALL PLAINTIFFS AGAINST MOTOROLA SOLUTIONS, INC., PRODUCTS LIABILITY – MANUFACTURING DEFECT

331.    Plaintiffs re-allege and incorporate each of the preceding paragraphs, and all subsequent paragraphs.

332.    Plaintiffs bring this strict liability claim against **Motorola** for manufacturing defects.

333.    At all relevant times, **Motorola** researched, tested, developed, manufactured, marketed, sold and/or installed communications, radio, and security systems used for safety.

334.    **Motorola's** products, however, deviated in their construction or quality from the specifications or planned output in a manner that rendered them unreasonably dangerous. This defect rendered **Motorola's** products inoperable and/or ineffective in the life-or-death emergency at Robb Elementary School on May 24, 2022. This made **Motorola** products unusable and therefore dangerous to an extent beyond that which would be contemplated by the ordinary user of the product, with the ordinary knowledge common to the community as to the product's characteristics.  The above manufacturing defect was a producing cause of the injuries made the basis of this suit.

335.    Based on information and belief, **Motorola's** products were defective and unreasonably dangerous because they failed during normal use and when used as intended. **Motorola's** systems and devices failed inside the school building leaving first responders without information communicated from dispatch and/or other first responders.

336.    **Motorola** is liable to Plaintiffs for injuries caused as a result of its products' manufacturing defects.

337.    The products' defects were substantial and a producing cause of Plaintiffs' injuries.

338.   **Motorola** is liable for the physical harms caused in this case, and Plaintiffs plead for all of their damages as set forth below.

## XII.   DAMAGES

339.   As a result of the causes of action above, these Plaintiffs – as well as their whole community – have suffered a degree of loss, pain, anguish, and destruction of their lives beyond understanding. For each of those causes of actions, Plaintiffs seek all available damages at law, including the following:

**A.   SURVIVAL DAMAGES OF DECEASED PLAINTIFF**

340.   Pursuant to Texas Civil Practice and Remedies Code § 71.021, Plaintiffs plead for their funeral and burial expenses. They plead as well for the pain and mental anguish for each of the children and adults that lost their lives. This plea includes damages for the conscious physical pain and emotional pain from injuries, the torment and anguish of the fear of impending death, and the suffering for each of the following decedent:

a.   **Eva Mireles**

**B.   WRONGFUL DEATH BENEFICIARY DAMAGES OF SURVIVING PARENTS AND HEIRS**

341.   Pursuant to Texas Civil Practice and Remedies Code § 71.002, the surviving natural parent and child of **Deceased Plaintiff Eva Mireles** are wrongful death beneficiaries asserting claims arising out of the death of the **Deceased Plaintiff Eva Mireles** proximately caused by the foregoing claims. As such, Plaintiffs asserts claims for all recoverable damages as wrongful death beneficiaries, including the following claims:

a.   Pecuniary loss sustained in the past for the loss of the care, maintenance, support, services, advise, counsel, and reasonable contributions of a pecuniary value that the

Plaintiffs in all reasonable probability would have received from the **Deceased Plaintiff Eva Mireles** had she lived;

b.      Pecuniary loss that, in reasonable probability, will be sustained in the future;

c.      Loss of companionship and society in the past for the loss of the positive benefits flowing from the love, comfort, companionship, and society that the Plaintiffs in all reasonable probability would have received from the **Deceased Plaintiff Eva Mireles** had she lived;

d.      Loss of companionship and society that, in reasonable probability, will be sustained in the future;

e.      Mental anguish sustained in the past for the emotional pain, torment, and suffering experienced by the Plaintiffs; and

f.      Mental anguish that, in all reasonable probability, will be sustained in the future.

342.     Each of the above elements of wrongful death damages is being sought by the following natural parent and child of **Deceased Plaintiff Eva Mireles**:

a.      **Paula Mireles** (parent of **Eva Mireles**);

b.      **Adalynn Ruiz** (daughter of **Eva Mireles**)

### XIII.   <u>PUNITIVE AND EXEMPLARY DAMAGES</u>

343.     Plaintiffs re-allege and incorporate by reference each of the preceding paragraphs and all subsequent paragraphs as though fully restated herein.

344.     Each Defendant's conduct was done with reckless disregard and/or callous indifference to the federally protected rights of others impacted by the shooting and subsequent conduct of law enforcement agents at the scene on May 24, 2022.

345.    Defendants, and each of them, were objectively and subjectively aware of the serious and demonstrable risk of serious bodily injury and death associated with their conduct and that such risks were compounded and made worse by their inaction. With full knowledge of such risks, Defendants proceeded and did cause Plaintiffs to suffer grave, even terminal, physical and mental harm.

## XIV.   <u>RELIEF SOUGHT</u>

346.    Wherefore, Plaintiffs respectfully request that the Court enter Judgment as follows:

a.    For compensatory economic damages in an amount to be determined by the trier of facts in the amount in excess of the court's minimal jurisdiction.

b.    For an award of such punitive and exemplary damages in an amount to be determined by the trier of facts.

c.    For an award of reasonable attorney's fees pursuant to 42 U.S.C. § 1983 and its subdivisions, and

d.    For costs of suit and pre and post–judgment interest as permitted by law.

DATED: MAY 23, 2024

Respectfully submitted,


By:    *Reynaldo Diaz*
       REYNALDO DIAZ
       ACCIDENT INJURY ATTORNEY PC
       308 West Josephine Street
       San Antonio, Texas 78212
       Tel.: (210) 224-1000
       Fax: (210) 224-1030
       RD@ReyDiaz.law
       Texas State Bar Number 05805450
       ATTORNEY FOR PLAINTIFFS
       PAULA MIRELES and ADALYNN RUIZ